UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X
                                     |
ROYAL INDEMNITY COMPANY, as          |
successor in interest to ROYAL       |
INSURANCE COMPANY OF AMERICA,        |
                                     |
          Plaintiff,                 |
                                     |      02 Civ. 3175 (KMW)
     -against-                       |
                                     |      OPINION AND ORDER
DEEP SEA INTERNATIONAL and TEXAS     |
CAPITAL CORPORATION,                 |
                                     |
          Defendants,                |
                                     |
     -and-                           |
                                     |
FLEET NATIONAL BANK, as Intervenor.  |
                                     |
                                     |
-------------------------------------X
KIMBA M. WOOD, U.S.D.J.:

     This lawsuit arises from the sinking of the R/V ALOHA

("Aloha"), a research vessel owned by Defendant Deep Sea

International ("Deep Sea").  On the morning of February 7, 2002,

the Aloha sank in the Yucatán Channel, about 100 miles east of

Cancún, Mexico.  Deep Sea filed a claim with Plaintiff Royal

Indemnity Company ("Royal"),[1] the issuer of a policy insuring the

Aloha and the scientific equipment on board.  Royal then brought

this action seeking declaratory judgments that (1) Deep Sea's

insurance policy was void from the outset because Deep Sea

---

[1] Royal Indemnity Company was substituted as successor in
interest to Royal Insurance Company of America by order dated May 25,
2007.

1

misrepresented the Aloha's condition and value, and because Deep
Sea breached its warranties of seaworthiness; (2) Deep Sea did
not show the cause of the sinking; and (3) the sinking was not
caused by an event covered by the policy, but rather by the
Aloha's unseaworthy condition.[2]

Both parties have moved for summary judgment.  By report and
recommendation dated March 24, 2006 (the "Report"), Magistrate
Judge Frank Maas recommended that summary judgment be denied.
Royal and Deep Sea filed objections to the Report.  For the
reasons stated below, the Court agrees with the Report, and
summary judgment is denied.


**BACKGROUND**

The Report contains extensive factual background,
familiarity with which is assumed.  Royal Ins. Co. of Am. v. Deep
Sea Int'l, No. 02 Civ. 3175 (KMW) (FM), 2006 U.S. Dist. LEXIS
18992, at *3-16 (S.D.N.Y. Mar. 24, 2006) [hereinafter "Report"].


**LEGAL STANDARDS**

**I.    STANDARD OF REVIEW FOR SUMMARY JUDGMENT MOTIONS**

The Court may award summary judgment only when there is no
genuine issue as to any material fact and the moving party is

---

[2] Texas Capital Corporation, also named as a defendant, was
dismissed from this action on December 8, 2004.  Intervenor Fleet
National Bank was dismissed on November 25, 2002.

entitled to judgment as a matter of law.  <u>Town of Southold v. Town of E. Hampton</u>, 477 F.3d 38, 46 (2d Cir. 2007).  A genuine issue of material fact exists if there is enough evidence for a jury to return a verdict for the nonmoving party, in whose favor all inferences must be drawn and all ambiguities resolved.  <u>Id.</u>

## II.   <u>INTERPRETATION OF INSURANCE CONTRACTS</u>

Under New York law,[3] the Court should interpret an insurance contract "to give effect to the intent of the parties as expressed in the clear language of the contract."  <u>Parks Real Estate Purchasing Group v. St. Paul Fire & Marine Ins. Co.</u>, 472 F.3d 33, 42 (2d Cir. 2006) (internal quotation marks omitted). The Court must enforce as written any provision that is unambiguous.  <u>Id.</u>  As with any contract, whether an insurance contract is ambiguous is a question of law for the Court to decide.  <u>Id.</u>

## <u>DISCUSSION</u>

## I.   <u>GENUINE ISSUES OF MATERIAL FACT</u>

Before considering the parties' arguments for summary judgment, I will identify genuine issues of material fact that

---

[3] The Court has held that New York law governs this action, except for Deep Sea's thirteenth counterclaim (seeking attorneys' fees), which is governed by federal maritime law.  <u>Royal Ins. Co. of Am. v. Deep Sea Int'l</u>, No. 02 Civ. 3175 (KMW), at 4 (S.D.N.Y. Aug. 19, 2004) (Order).

are common to more than one argument.

## A.   __Cause of the Sinking__

Royal and Deep Sea have presented competing theories about what caused the ingress of water that led to the sinking of the Aloha: Deep Sea has offered evidence that the ingress was caused by a latent defect compounded by crewmember negligence (see Def.'s Rule 56.1 Statement ¶¶ 62-63, 65-67, 91, 94; Wiener Decl., Ex. H (Report of Costas Georgas), at 28-30), while Royal has offered evidence that it was caused by the hull's wasted condition (see Nicoletti Aff., Ex. 21 (Report of James L. Dolan), at 3-4; id., Ex. 22 (Report of George Randall), at 8-9; id., Ex. 23, at 3-5 (Report of Lucius Pitkin, Inc.)).  These competing explanations create a genuine issue of material fact on the issue of causation.

This conclusion does not depend on the admissibility of Royal's expert witnesses on causation, which the Court declines to consider at this stage.  Deep Sea argues that this expert testimony is Royal's only evidence on the issue of causation. This argument is baseless.  Royal has offered evidence that, during past drydockings, some plates on the hull of the Aloha were found to have diminished in thickness by more than 25 percent, and others were found to contain pinhole damage. (See Pl.'s Rule 56.1 Statement ¶¶ 37-38, 55-56, 61, 72.)  Royal

has also provided evidence that some of these damaged areas were
not cropped and renewed but were instead repaired by means of
doubler plates,[4] and that doubler plates are not generally
considered a proper method of permanent repair.  (See id. ¶¶ 40-
42, 57-58, 62-64, 71-72.)  On at least one occasion (the 1999
drydocking), the Aloha's hull admitted water after the ship was
refloated, even though the hull had just been inspected for
damage.  (See id. ¶ 59.)  Finally, the chief surveyor of the
Panama Bureau of Shipping testified that welding doubler plates
over pitted areas of the hull can exacerbate corrosion.  (See
Nicoletti Aff., Ex. 8 (Deschapelles Dep.), at 253-54.)  If a jury
were to credit this evidence, it could reasonably conclude that
the hull's wasted condition was not properly repaired and that
the wastage caused the rupture that allowed water to enter the
ship, either beneath a doubler plate or in another location.[5]
Because jurors are "'as capable of comprehending [these] primary
facts and of drawing correct conclusions from them as are

---

[4] Although Deep Sea objects that its repairs were not improper
"doublers" but proper "straps" (see Def.'s Objections to Report 8
n.3), shipyard invoices describe the repairs as "doublers" (see
Nicoletti Aff., Ex. 32 (Calcasieu Shipyard Invoice), ¶ 12), and at
least one witness testified that the two terms are identical (see id.,
Ex. 8 (Deschapelles Dep.), at 226-27).

[5] Deep Sea objects that "the alleged deficiencies in the hull
were located aft of the engine room watertight bulkhead, while the
water ingress was undisputedly forward of that bulkhead."  (Def.'s
Objections to Report 8.)  Although Deep Sea may present this argument
to the jury, Royal has presented enough evidence that the hull was
thinned or damaged in multiple locations that summary judgment is
precluded.

witnesses possessed of special or peculiar training,'" <u>Wills v. Amerada Hess Corp.</u>, 379 F.3d 32, 46 (2d Cir. 2004) (quoting <u>Salem v. U.S. Lines Co.</u>, 370 U.S. 31, 35 (1962)), a genuine issue of material fact exists, whether or not Royal's expert testimony is admissible.   The Court therefore denies Deep Sea's motion to exclude the reports of James Dolan, George Randall, and Lucius Pitkin, Inc., but Deep Sea may renew the motion closer to trial.

**B.    <u>Seaworthiness: Condition of the Aloha's Hull</u>**

As explained in the preceding section, the parties dispute whether Deep Sea used proper methods to repair the Aloha's hull when the vessel was in drydock in 1996, 1999, and 2000. Magistrate Judge Maas noted that whether the condition of the hull detected on those occasions was "generalized wastage (which required cropping and renewal) or a localized problem fairly described as 'pitting' (which could be dealt with in another fashion)" is a question of fact that cannot be resolved on summary judgment.   Report, 2006 U.S. Dist. LEXIS 18992, at *26.[6] The Court agrees.

Because the Court cannot resolve whether the ship's hull was

---

[6] Deep Sea objects to this conclusion.  (Def.'s Objections to Report 6.)  But the objection is unfounded: Royal has presented evidence that certain areas of the hull were so damaged or thinned that the only proper repair would have been cropping and renewing, yet cropping and renewing was not performed.  (<u>See</u> Pl.'s Rule 56.1 Statement ¶¶ 22, 24, 37, 39-40, 55, 58, 62, 64, 71, 74-75.)

properly repaired, it also cannot resolve (1) whether the Aloha was seaworthy after the final drydocking in 2000,[7] and (2) whether Deep Sea exercised due diligence in conducting the 1996, 1999, and 2000 repairs.

## C.   <u>Seaworthiness: Condition of the Electrical System</u>

The Aloha experienced an electrical blackout the day before it left port, after the port main generator malfunctioned. (Pl.'s Rule 56.1 Statement ¶ 78; Def.'s Rule 56.1 Response ¶ 78.) A third-party electrical contractor determined that the blackout was caused by the failure of the generator's metal oxide varistor, or MOV.  (Pl.'s Rule 56.1 Statement ¶ 80.)  The ship departed without the installation of a new MOV on the portside generator.  (<u>Id.</u> ¶ 86.)

The Court agrees with Magistrate Judge Maas that a factual issue exists regarding the extent to which the failure to replace the MOV contributed to the sinking.  <u>See</u> Report, 2006 U.S. Dist. LEXIS 18992, at *29.  There are therefore also factual issues

---

[7] "Seaworthiness" means "the ability of a vessel adequately to perform the particular services required of her on the voyage she undertakes."  <u>McAllister Lighterage Line, Inc. v. Ins. Co. of N. Am.</u>, 244 F.2d 867, 870 (2d Cir. 1957).

Although a presumption of unseaworthiness arises when a vessel sinks in calm weather or fair seas, <u>see</u> <u>South, Inc. v. Moran Towing & Transp. Co.</u>, 360 F.2d 1002, 1005 (2d Cir. 1966), the parties have presented competing evidence about whether the waves before and during the sinking were fair or rough.  (<u>Compare</u> Nicoletti Aff., Ex. 25 (Report of Robert A. Raguso), at 11, <u>with</u> Wiener Decl., Ex. Q (Report of Austin L. Dooley), at 4.)

about whether the failure to replace the MOV (1) rendered the Aloha unseaworthy, or (2) constituted a lack of due diligence by Deep Sea.

## II.  COVERAGE UNDER THE INSURANCE POLICY

The first issue to be resolved is whether Deep Sea has successfully stated a claim for coverage of (1) the Aloha itself and (2) the research scientific equipment aboard ship.

## A.  Coverage of the Aloha

Deep Sea's insurance policy, which took effect on August 5, 2001 for a term of one year, contains two clauses relevant to Deep Sea's claim for coverage of the Aloha: (1) the main policy's "perils" clause and (2) Endorsement 2, the "liner negligence clause."[8]  Deep Sea may not recover the value of the Aloha unless the ship's loss comes within the scope of at least one of these two clauses.

## 1.  Scope of Coverage Under the Perils Clause

The perils clause insures the Aloha against damage resulting

---

[8] The parties agree that the liner negligence clause supplants the "additional perils" or "Inchmaree" clause found in the main policy.  The Court therefore need not separately analyze the coverage provided by the Inchmaree clause.

from a limited number of enumerated causes, or "perils."[9]  To recover under this provision, Deep Sea has the burden of proving that the sinking was proximately caused by a covered peril.  Nw. Mut. Life Ins. Co. v. Linard, 498 F.2d 556, 561 (2d Cir. 1974). If Deep Sea claims the loss was caused by a peril of the sea, it must prove that the loss resulted "from the fortuitous (unforeseen and unanticipated) action of the sea," rather than from "the defective, deteriorated or decayed condition of the vessel or from ordinary wear and tear." Sipowicz v. Wimble, 370 F. Supp. 442, 448 (S.D.N.Y. 1974).

**2.   Scope of Coverage Under the Liner Negligence Clause**

The liner negligence clause, or LNC, insures against loss or damage to the ship caused by (1) latent defects in the machinery or hull, (2) accidents, or (3) the negligence of any person.  It excludes any loss or damage caused by a lack of due diligence by

---

[9] The perils clause reads:
Touching the adventures and perils which the Underwriters are contented to bear and take upon themselves, they are of the Seas, Men-of-War, fire, lightning, earthquake, Enemies, Pirates, Rovers, Assailing Thieves, Jettisons, Letters of Mart and Counter-Mart, Surprisals, Takings at Sea, Arrests, Restraints and Detainments of all Kings, Princes, Peoples, of what nation, condition or quality soever, Barratry of the Master and Mariners and of all other like Perils, Losses and Misfortunes that have or shall come to the Hurt, Detriment or Damage of the Vessel, or any part thereof, excepting, however, such of the foregoing perils as may be excluded by provisions elsewhere in the Policy or by endorsement thereon.
(Wiener Decl., Ex. A (Policy), at C-000727.)

the ship's owners.[10]

Although Deep Sea argues that the LNC's language is so broad as to constitute "all risks" coverage -- which would shift the initial burden of proof to Royal, see Miller Marine Servs., Inc. v. Travelers Prop. Cas. Ins. Co., No. 04 CV 5679 (ILG), 2005 WL 2334385, at *4 (E.D.N.Y. Sept. 23, 2005) -- the language of the clause does not support this interpretation.   The LNC covers damage from three specific causes; it does not contain language purporting to cover damage from all causes.[11]   Had the drafters

---

[10]   The LNC reads, in relevant part:
      Subject to the conditions of this Policy, this insurance also covers:
      a) Breakdown of motor generators or other electrical machinery and electrical connections thereto; bursting of boilers; breakage of shafts; or any latent defect in the machinery or hull;
      b) Loss of or damage to the subject matter insured directly caused by:
      1) Accidents on shipboard or elsewhere . . . ;
      2) Negligence, error of judgment or incompetence of any person; excluding under both "a" and "b" above only the cost of repairing, replacing or renewing any part condemned solely as a result of a latent defect, wear and tear, gradual deterioration or fault or error in design or construction;
      provided such loss or damage (either as described in said "a" or "b" or both) has not resulted from want of due diligence by the Assured(s), the Owner(s) or Manager(s) of the Vessel, or any of them.
(Wiener Decl., Ex. A (Policy), at C-000742.)

[11] By comparison, several other decisions cited by Deep Sea do involve insurance policies with such all-encompassing language.  See Atl. Lines Ltd. v. Am. Motorists Ins. Co., 547 F.2d 11, 12 (2d Cir. 1976) (interpreting policy covering losses from "'any external cause'"); St. Paul Fire & Marine Ins. Co. v. SSA Gulf Terminals, Inc., Civ. Action No. 01-3063, 2002 U.S. Dist. LEXIS 19138, at *20 (E.D. La. Oct. 8, 2002) (interpreting policy covering losses from "'other causes of whatsoever nature'"); Int'l Ship Repair & Marine Servs., Inc. v. St. Paul Fire & Marine Ins. Co., 944 F. Supp. 886, 891 (M.D. Fla. 1996) (same).  These decisions are not relevant to the interpretation

of the policy intended the clause to cover all risks, they would
have used the same language they used in Endorsement 11, which
insures the research scientific equipment (not the vessel as a
whole) against "all risks of direct physical loss of or damage to
the property covered from any external cause," except as
specifically excluded.  (Wiener Decl., Ex. A (Policy), at C-
000752.)  The broader wording of Endorsement 11 underscores the
narrower reach of the LNC.  See Sayers v. Rochester Tel. Corp.
Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 1095 (2d Cir. 1993)
(directing courts to interpret contract provisions "in the
context of the entire agreement" (internal quotation marks
omitted)).[12]  The existence of the perils clause also argues
against Deep Sea's interpretation: if the LNC insured against all
risks, the perils clause would be superfluous.  See Rothenberg v.
Lincoln Farm Camp, Inc., 755 F.2d 1017, 1019 (2d Cir. 1985)
("[A]n interpretation that gives a reasonable and effective

of the LNC.

[12] This conclusion is consistent with the statement of one
treatise author that the LNC is "really a species of 'all risks'
policy."  1 Alex L. Parks, The Law and Practice of Marine Insurance
and General Average in the United States 404 (1987); see also
Employers Ins. of Wausau v. Occidental Petrol. Corp., 978 F.2d 1422,
1438 (5th Cir. 1992) (quoting Parks).  As Magistrate Judge Maas noted,
"[t]his language . . . is simply a recognition that the LNC greatly
expands an insured's coverage, leaving only a narrow avenue for an
insurer to escape its increased exposure."  Report, 2006 U.S. Dist.
LEXIS 18992, at *39; see also Leslie J. Buglass, Marine Insurance and
General Average in the United States: An Average Adjuster's Viewpoint
136-37 (2d ed. 1981) (describing LNCs as "a form of 'all risks'
insurance," yet also noting that "accident" is required for insured to
state claim).

meaning to all the terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect . . . ."). To recover under the LNC, Deep Sea therefore has the burden of proving that the Aloha sank because of a latent defect, an accident, or negligence, and not from a lack of due diligence.

**3.    Summary Judgment Is Precluded With Respect to Either Clause**

To recover under either clause, Deep Sea must prove the cause of the sinking.  Because a genuine issue of material fact exists with regard to causation, whether the loss of the Aloha is covered under either clause of the hull policy cannot be determined before trial.[13]

**B.    Scientific Equipment Coverage**

**1.    Scope of Coverage**

Endorsement 11 of the policy covers the research scientific equipment aboard the Aloha on an all-risks basis.[14]  To state a

---

[13] Deep Sea separately contends that it is entitled to summary judgment that Royal must pay the stipulated value of $1,616,000, plus interest.  Deep Sea acknowledges that this stipulation binds the parties only in the absence of fraud or concealment.  See Occidental Petrol. Corp. v. N.H. Ins. Co., 506 F. Supp. 606, 608 (S.D.N.Y. 1981). As Magistrate Judge Maas concluded, and as explained below, whether Deep Sea misrepresented the Aloha's value is a genuine issue of material fact, foreclosing summary judgment on the issue.  Neither party has objected to this conclusion, with which the Court agrees.

[14] Endorsement 11 reads, in relevant part, "This Policy insures against all risks of direct physical loss of or damage to the property covered from any external cause, except as hereinafter excluded." (Wiener Decl., Ex. A (Policy), at C-000752.)  None of the exclusions

claim, Deep Sea must prove that the loss of the equipment was fortuitous.  See Ingersoll Milling Mach. Co. v. M/V Bodena, 829 F.2d 293, 307 (2d Cir. 1987).  A loss is fortuitous unless it results from "an inherent defect, ordinary wear and tear, or intentional misconduct of the insured."  Id.; see also Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Stroh Cos., 265 F.3d 97, 106 (2d Cir. 2001) ("[T]he fortuity doctrine holds that insurance is not available for losses that the policyholder knows of, planned, intended, or is aware are substantially certain to occur." (internal quotation marks omitted)).  The Second Circuit has not decided whether a loss is fortuitous if it results from merely reckless misconduct.  Youell v. Exxon Corp., 48 F.3d 105, 110-11 (2d Cir.), vacated on other grounds, 516 U.S. 801 (1995).

Magistrate Judge Maas concluded that the issue cannot be resolved on summary judgment, because there is a factual issue as to whether Deep Sea properly repaired the vessel, and because a reasonable jury that accepted Royal's evidence could conclude that Deep Sea's failure to maintain the vessel rose to the level of intentional misconduct.  Report, 2006 U.S. Dist. LEXIS 18992, at *37.  Deep Sea objects to this conclusion.

The Court agrees with the Report.  If the jury credited Royal's evidence, it could reasonably find that Deep Sea

applies here.  Endorsements 12, 16, and 18 contain schedules of the covered equipment.

intentionally chose inadequate methods to repair the Aloha, despite being aware that those methods violated the standards required of Panamanian-flagged ships.  The jury could then find Deep Sea's actions to be intentional misconduct even in the absence of outright fraud.[15]  See City of Burlington v. Indem. Ins. Co. of N. Am., 332 F.3d 38, 48 (2d Cir. 2003) (listing "intentional or fraudulent losses" as exceptions to fortuity (emphasis added)).  Deep Sea is therefore not entitled to summary judgment with respect to the fortuitous nature of the loss of the scientific equipment.

## 2.   Valuation of the Scientific Equipment

a.   Deep Sea's Motion for Summary Judgment

Deep Sea seeks summary judgment on its claim that the scientific equipment coverage should be interpreted as specifying an agreed value for the equipment.  In Endorsements 12, 16, and 18, each item of scientific equipment is identified and coupled with a dollar figure labeled "Insured Amount" or "Value."  Deep Sea argues that these figures are agreed values that Royal must pay if Deep Sea successfully states a claim; Royal contends that they are caps on recovery, and that Royal owes Deep Sea only the "actual retail replacement cost" of each item, as specified in

---

[15] Royal disputes Deep Sea's claim that Deep Sea disclosed to Royal and to the Panama Bureau of Shipping the nature of all repairs. (See Pl.'s Rule 56.1 Response ¶¶ 2, 93.)

Endorsement 11.[16]

Like Magistrate Judge Maas, the Court agrees with the latter view.  Clause 11(a) of Endorsement 11 states that Royal "shall not be liable for more than the actual retail replacement cost of the property at the time any loss or damage occurs" and that "loss or damage shall be ascertained or estimated on the basis of the actual cash retail replacement cost of property in kind to that insured . . . , but in no event to exceed the stipulated amount of Insurance stated in the schedule."  (Wiener Decl., Ex. A (Policy), at C-000754.)  The unambiguous meaning of this provision is that the dollar figures in the schedule are ceilings on recovery.  The phrases "actual retail replacement cost" and "actual cash retail replacement cost" mean that Royal shall pay

---

[16] The relevant portions of Endorsement 11 read as follows:
        8.  Obsolete Equipment Clause
        It is warranted that in the event of loss and/or damage to equipment arising from an insured peril, the Assured's rights to recovery shall be limited to the normal and customary cost of replacement as though such items were readily available on the local market.  This Company is not to be held liable for increased cost of repair and/or replacement due to the unavailability and/or obsolescence of integral parts or the whole of equipment.
        . . .
        11.  Valuation
        a)  As respects Coverage A - Scientific Equipment:
        The Company shall not be liable for more than the actual retail replacement cost of the property at the time any loss or damage occurs and the loss or damage shall be ascertained or estimated on the basis of the actual cash retail replacement cost of property in kind to that insured at the place of and immediately preceding the time of such loss or damage, but in no event to exceed the stipulated amount of Insurance stated in the schedule.
(Wiener Decl., Ex. A (Policy), at C-000754.)

Deep Sea the actual market cost of replacement equipment measured from the date of the sinking.  Should the actual retail replacement cost of an item exceed the stipulated figure in Endorsement 12, 16, or 18, Royal may pay the lesser of the two amounts.[17]  Both the original purchase price and the depreciated 2002 value of the lost equipment are irrelevant.[18]

Deep Sea objects that the Court should construe Endorsement 11 in light of extrinsic evidence.  The Court disagrees, because the language of the endorsement is unambiguous.  See Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2d Cir. 1989) ("Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation.").  The Court should therefore apply the policy's terms without looking beyond its four corners. Andy Warhol Found. for the Visual Arts, Inc. v. Fed. Ins. Co.,

---

[17] This interpretation is shared by Deep Sea's own expert on insurance practice, John A. Hickey.  (See Wiener Decl., Ex. M (Report of John A. Hickey), at 2 ("The only limitation would be that payment shall not exceed the stipulated amount of insurance stated in the policy for scheduled items.").)

[18] Clause 8 of Endorsement 11, the obsolete equipment clause, does not alter this view.  It states that in the event the insured equipment is obsolete, Deep Sea's rights to recovery "shall be limited to the normal and customary cost of replacement as though such items were readily available on the local market," and that Royal "is not to be held liable for increased cost of repair and/or replacement" due to the items' obsolescence.  (Wiener Decl., Ex. A (Policy), at C-000754.) This provision clarifies that if the lost equipment was obsolete at the time of the sinking, Royal need not factor in the additional expense of procuring now-outmoded items, but may substitute the "normal and customary" cost of nonidentical replacement equipment.

16

189 F.3d 208, 215 (2d Cir. 1999).  For the same reason, the Court need not construe the policy against the drafter, a rule of construction that applies only to ambiguous contracts (and even then as a last resort).  I.V. Servs. of Am., Inc. v. Trs. of the Am. Consulting Eng'rs Council Ins. Trust Fund, 136 F.3d 114, 121 n.8 (2d Cir. 1998).

b.  Royal's Cross-Motion

Independent of its summary judgment motion, Royal submitted a cross-motion regarding valuation of scientific equipment, asking the Court to declare that Deep Sea is entitled to recover only $716,000 or less under its research scientific equipment coverage.  Royal derived this figure from its expert's conclusion that $716,000 represents "[t]he current value of Insured Equipment . . . taking into account for individual items of equipment the determinations of usability, acceptability or equivalency."  (Nicoletti Aff., Ex. 41 (Report of Fisher Maritime), at 4.)  Royal's expert calculated the current value of insured equipment by multiplying each item's claimed purchase value by a depreciation factor, based on how acceptable the item is to current consumers.  (Id. at 2-3.)

As explained above, under the unambiguous terms of the research scientific equipment coverage, the depreciated value of the lost equipment is irrelevant.  Rather, the "actual retail

17

replacement cost" of the lost equipment is the value of equipment that can actually replace the lost items.  Because Royal's cross-motion regarding valuation of scientific equipment measures the value of Deep Sea's recovery by an incorrect method, it is denied.


**III. <u>DENIAL OF COVERAGE</u>**

Notwithstanding the scope of any insurance coverage of the Aloha and the research scientific equipment, Royal is entitled to summary judgment if Deep Sea's actions rendered the coverage void.[19]  Royal argues that Deep Sea's insurance policy is void <u>ab initio</u> for two reasons: (1) the doctrine of <u>uberrimae fidei</u> and (2) the absolute and negative implied warranties of seaworthiness.


**A.   <u>Uberrimae Fidei</u>**

Under federal maritime law, the parties to a marine insurance contract are held to the standard of <u>uberrimae fidei</u>, or "utmost good faith."  This standard requires a party seeking insurance to disclose to the underwriter all circumstances it

---

[19] The scientific equipment coverage provided in Endorsements 11, 12, 16, and 18 is part of the larger policy and not, as Deep Sea argues, a separate policy.  The "Research Scientific Equipment Coverage" and the schedules of equipment are clearly labeled as "endorsements" and not separate policies, and they share Policy Number P2OH006873 with the rest of the coverage.  As a result, were summary judgment to issue finding the policy void <u>ab initio</u>, the scientific equipment coverage would be void as well.

knows of that materially affect the risk.[20] <u>Folksamerica Reinsurance Co. v. Clean Water of N.Y., Inc.</u>, 413 F.3d 307, 311 (2d Cir. 2005).  A circumstance is material only if it would have controlled the underwriter's decision.  <u>Puritan Ins. Co. v. Eagle S.S. Co.</u>, 779 F.2d 866, 871 (2d Cir. 1985).  If the insured does not make the requisite disclosures, the policy can be declared void <u>ab initio</u>.  <u>See</u> <u>Atl. Mut. Ins. Co. v. Balfour MacLaine Int'l Ltd.</u> (<u>In re Balfour MacLaine Int'l Ltd.</u>), 85 F.3d 68, 81 (2d Cir. 1996).  The burden of proof of a material nondisclosure or of a misrepresentation lies with the insurer.  <u>See</u> <u>Farr Man Coffee Inc. v. Chester</u>, No. 88 Civ. 1692 (DNE), 1993 WL 248799, at *37 (S.D.N.Y. May 28, 1993); <u>Albany Ins. Co. v. Wisniewski</u>, 579 F. Supp. 1004, 1015 (D.R.I. 1984).[21]

---

[20] Second Circuit case law is imprecise with respect to how actively an insured must disclose material facts.  <u>Compare</u> <u>Knight v. U.S. Fire Ins. Co.</u>, 804 F.2d 9, 13 (2d Cir. 1986) ("Since the assured is in the best position to know of any circumstances material to the risk, he must reveal those facts to the underwriter, rather than wait for the underwriter to inquire."), <u>with</u> <u>Puritan Ins. Co. v. Eagle S.S. Co.</u>, 779 F.2d 866, 871 (2d Cir. 1985) ("A minute disclosure of every material circumstance is not required.  The assured complies with the rule if he discloses sufficient to call the attention of the underwriter in such a way that, if the latter desires further information, he can ask for it." (internal quotation marks omitted)).
Deep Sea argues that "an underwriter has an obligation to ask questions of the insured[] concerning the material elements of the risk" (Def.'s Mem. of Law in Opp'n 4), but it provides no case law in support of this position.

[21] Deep Sea notes that <u>uberrimae fidei</u> does not require the insured to communicate "matters of general knowledge . . . , including well-established customs and usages."  <u>Anne Quinn Corp. v. Am. Mfrs. Mut. Ins. Co.</u>, 369 F. Supp. 1312, 1315 (S.D.N.Y. 1973).  Although the insurer is thus charged with knowledge of "the normal pattern of expectable maintenance and upkeep" of the vessel, <u>Contractors Realty Co. v. Ins. Co. of N. Am.</u>, 469 F. Supp. 1287, 1295 (S.D.N.Y. 1979),

Royal alleges that when Deep Sea applied for insurance coverage, it failed to disclose or misrepresented three facts: (1) the seaworthiness of the Aloha, (2) the validity of the Aloha's cargo ship safety and load line certificates, and (3) the Aloha's true value.  Royal is entitled to summary judgment only if there is no factual dispute that Deep Sea misrepresented or failed to disclose these facts and that they were material to Royal's decision to insure the Aloha.

The first alleged reason to void the policy, the ship's seaworthiness, presents a genuine issue of material fact, as explained above.  The second allegation depends on the same factual issue: the cargo ship safety and load line certificates were invalid only if Deep Sea gave the Panama Bureau of Shipping inaccurate or incomplete information about the hull's condition.

There is also a disputed issue of material fact presented by the third purported misrepresentation, that Deep Sea claimed the Aloha's value to be $1,616,000 rather than its allegedly true value of less than $1,175,000, and then wrongly attributed the full difference between the figures to the value of new equipment.  There is evidence that Deep Sea arrived at the higher figure in good faith (Def.'s Rule 56.1 Response ¶¶ 92-93; Nicoletti Aff., Ex. 3 (Galerne Dep.), at 311-14, 350-52) and that

---

Royal's allegations here presuppose that the manner in which Deep Sea repaired the Aloha was neither normal nor expectable.

Royal underwriter John Ellis never believed the surveyed market value of $1,175,000 to be the same as the ship's agreed value for insurance purposes (Wiener Decl., Ex. PP (E-mail to John Ellis)). There is also evidence that Deep Sea volunteered the correct value of the newly installed equipment to Ellis before the policy was issued in August 2001.  (Def.'s Rule 56.1 Response ¶ 95.) Based on this evidence, a reasonable jury could find that Deep Sea did not misrepresent or fail to disclose the Aloha's true value.

**B.    Implied Warranties of Seaworthiness**

Royal next argues that it is entitled to summary judgment because Deep Sea violated its absolute and negative implied warranties of seaworthiness.

**1.    Absolute Implied Warranty of Seaworthiness**

Under the "'drastic'" terms of the absolute implied warranty of seaworthiness, if a vessel is not seaworthy at the inception of the insurance policy, then no recovery can be had under the policy.  Employers Ins. of Wausau v. Occidental Petrol. Corp., 978 F.2d 1422, 1432 (5th Cir. 1992) (quoting Grant Gilmore & Charles L. Black, The Law of Admiralty § 2-6, at 63 (2d ed. 1975)).  It is irrelevant whether the insured had knowledge of the unseaworthy condition or was at fault in failing to discover

it.  Id. at 1436.

Although United States maritime law recognizes an absolute
implied warranty of seaworthiness in "voyage" insurance
policies, see id. at 1432, United States authorities are divided
about whether the warranty is also implied in "time" policies
like Deep Sea's.[22]  Some Second Circuit decisions have recognized
an absolute warranty in time policies.  See McAllister Lighterage
Line, Inc. v. Ins. Co. of N. Am., 244 F.2d 867, 870 (2d Cir.
1957); Henjes v. Aetna Ins. Co., 132 F.2d 715, 719 (2d Cir.
1943).  But at least one Second Circuit opinion took a contrary
position, see N.Y., New Haven & Hartford R.R. Co. v. Gray, 240
F.2d 460, 466 & n.10 (2d Cir. 1957) (rejecting warranty, and
dismissing contrary statements in earlier cases as dicta), and
the appeals court has not addressed the contradiction.

Despite this uncertainty, the Court agrees with the Report
that an absolute warranty of seaworthiness is implied in time
hull insurance policies.  After a careful examination of case
law, history, and policy, Judge Cote concluded that the Second
Circuit would find the absolute warranty applicable to time
policies were the court confronted with the issue today.  Cont'l
Ins. Co. v. Lone Eagle Shipping Ltd. (Liber.), 952 F. Supp. 1046,

---

[22] As the names suggest, a time policy is effective for a fixed
term, while a voyage policy covers a single voyage of unspecified
duration.  See Robert H. Brown, Dictionary of Marine Insurance Terms
286, 302 (1962).  Deep Sea's policy lasted for one year.

1066-67 (S.D.N.Y. 1997).  In Wausau, the Fifth Circuit reached
the same conclusion after reviewing the history of the implied
warranties of seaworthiness in Britain and the United States.
Wausau, 978 F.2d at 1432-35.  The Eighth Circuit has also taken
this position.  L & L Marine Serv., Inc. v. Ins. Co. of N. Am.,
796 F.2d 1032, 1035 (8th Cir. 1986).  However, the absolute
warranty is implied only when the insured vessel was in port at
the time the policy period began.  The Second Circuit has noted
this rule in dicta, see Henjes, 132 F.2d at 719; N.Y. & P.R. S.S.
Co. v. Aetna Ins. Co., 204 F. 255, 258 (2d Cir. 1913), and more
recent cases from this district have adopted it explicitly, see
Am. Home Assurance Co. v. Masters' Ships Mgmt. S.A., 423 F. Supp.
2d 193, 226 (S.D.N.Y. 2006); Cont'l Ins. Co., 952 F. Supp. at
1069.  Cf. Wausau, 978 F.2d at 1435 (declining to decide whether
absolute warranty is implied when policy begins while vessel is
at sea).

Although time policies contain an absolute implied warranty
of seaworthiness, the warranty is partially abrogated here by the
language of the liner negligence clause.  The Wausau court
reasoned that, because the LNC and the absolute warranty are
partially incompatible, the LNC should take precedence, lest the
insured be denied any means of disclaiming the absolute warranty.
Wausau, 978 F.2d at 1438.  This reasoning is sound.  The LNC
waives the absolute warranty with respect to unseaworthiness

23

caused by latent defects, accidents, or the negligence of any person, but not with respect to unseaworthiness caused by a lack of due diligence by the ship's owners.  See id. at 1439.  Thus, if the Aloha was unseaworthy on August 5, 2001 by virtue of Deep Sea's lack of due diligence, the policy is void ab initio.

Applying these standards, Royal's motion for summary judgment on Deep Sea's absolute implied warranty of seaworthiness fails for two reasons.  First, as discussed above, there are genuine disputes of material fact about (1) whether the Aloha was unseaworthy and, if so, (2) whether its unseaworthiness was caused by lack of due diligence by Deep Sea.  Second, the absolute warranty is implied only if the insured ship was in port when the policy period began.  The parties have not identified whether the Aloha was in port or at sea on August 5, 2001, the starting date of the policy.

**2.   Negative Implied Warranty of Seaworthiness**

The negative implied warranty of seaworthiness is narrower than the absolute warranty in two ways: it applies only if the insured knew the ship was unseaworthy, and it invalidates coverage only for loss or damage proximately caused by the unseaworthy condition.  Cont'l Ins. Co., 952 F. Supp. at 1070. But while the absolute warranty is implied once, at the inception of the insurance policy, the negative version is an ongoing

promise that the insured will not "knowingly send a vessel to sea in an unseaworthy condition." <u>Wausau</u>, 978 F.2d at 1432.  The negative warranty is therefore implied each time a vessel leaves "the safety of a port for the open sea." <u>Cont'l Ins. Co.</u>, 952 F. Supp. at 1071.

Royal argues that when the Aloha left Morgan City, Louisiana on February 3, 2002, Deep Sea knew it was unseaworthy by virtue of the purportedly improper hull repairs and the malfunctioning MOV.  As noted above, the ship's seaworthiness with respect to both conditions is a disputed fact.  The Court therefore agrees with Magistrate Judge Maas that summary judgment on the negative implied warranty is inappropriate.


**IV.   <u>MOTION TO PRECLUDE EXPERT TESTIMONY</u>**

Royal has made a cross-motion <u>in limine</u> to preclude the testimony of two of Deep Sea's expert witnesses, John Hickey and Peter Schermerhorn, pursuant to Federal Rule of Evidence 702. Because the motion need not be decided in order to resolve the motions for summary judgment, Magistrate Judge Maas recommended that the motion be denied without prejudice, a recommendation to which Royal does not object.  The Court agrees that the motion need not be decided now, and it is therefore denied without

prejudice.[23]

## CONCLUSION

For the reasons stated above, Royal's motion for summary judgment (docket number 126) and Deep Sea's motion for summary judgment (docket number 121) are DENIED.  Royal's cross-motion to preclude expert testimony (docket number 135) is DENIED without prejudice.  Royal's cross-motion regarding the valuation of scientific equipment (docket number 144) is DENIED.

The parties shall submit a joint pretrial order by August 10, 2007.


                    SO ORDERED.

Dated:     New York, New York
           July 11, 2007

                              _____
                                    Kimba M. Wood
                              United States District Judge

---

[23] As noted above, Deep Sea's motion to preclude three expert witnesses is similarly denied without prejudice.

26